James G. SIMMONS, Edward L. Weaver, Sr., Edward L. Weaver, Jr., Dr. Robert L. Tucker, Jr., Dr. James L. Thomas, and Jack Hall, d/b/a Cabana Theatres and Cabana Theatre of Jackson, Inc., Plaintiffs–Appellants,

v.

O'CHARLEY'S, INC., Defendant–Appellee.

Court of Appeals of Tennessee, Western Section, at Jackson.

Aug. 3, 1995.

Application for Permission to Appeal Denied by Supreme Court Dec. 11, 1995.

Lloyd R. Tatum, Tatum & Tatum, Henderson, for Appellants.

Laurence M. Papel and J. Steven Krikham, Manier, Herod, Hollabaugh & Smith, Nashville, for Appellee.

CRAWFORD, Judge.

This case is before the Court for the second time. On May 10, 1991, plaintiffs-appellants filed a complaint for declaratory judgment to determine their rights under a lease agreement and related contracts and for affirmative relief. One of the defendants, O'Charley's, Inc., the purchaser of the real estate covered by the lease agreement, filed a counterclaim in which it sought possession of the leased property and damages for, *inter alia,* breach of contract and unlawful

detainer. In November of 1991, the trial court dismissed the appellants' suit for affirmative relief for failure to state a claim upon which relief can be granted, and this Court affirmed the trial court's ruling. The case was remanded for proceedings on O'Charley's, Inc.'s counterclaim for damages. *Simmons v. O'Charley's, Inc.*, No. 02A01–9112–CH–00321, 1992 WL 141793 (Tenn.App.W.S. June 25, 1992).

The only matter before the trial court on remand was a determination of alleged damages due O'Charley's on its counterclaim against the original plaintiffs and counterdefendants. After a nonjury trial, the court entered judgment against the appellants in the amount of Three Hundred Fifty–Six Thousand Two Hundred Thirty Dollars ($356,230) for lost profits occasioned by the delay in beginning construction because the appellants had not vacated the property.

The record establishes that O'Charley's was entitled to possession of the property on May 11, 1991, and the appellants did not vacate the premises until September 14, 1991. Gregory Burns, president of O'Charley's, testified that it was the intent of O'Charley's to begin construction immediately after obtaining the right to possession of the property on May 11, 1991. But for the appellants' unlawful occupation, construction would have started at that time. O'Charley's presented proof that it had been delayed a total of one hundred sixty-two (162) days consisting of one hundred twenty-seven (127) days for withholding possession and thirty-five (35) days of construction delay due to seasonal inclement weather. O'Charley's also introduced proof concerning the average daily profit for a period of time after the restaurant opened to establish a basis for daily profits allegedly lost by the delay.

Mr. Burns also introduced as an exhibit a letter dated May 3, 1991, from Laurence Papel, the attorney for O'Charley's to the appellants, James G. Simmons, Edward L. Weaver, Sr., Robert T. Tucker, M.D., James L. Thomas, M.D., and Cabana Theatre of Jackson, Inc., which we quote:

**Re:** Lease (the "Lease") from James H. Wallace, Jr., et al, ("Lessors or Lessor") to Cabana Theatre of Jackson, Inc. ("Cabana"), *et al,* ("Lessee or Lessees") dated May 10, 1971

Gentlemen:

I represent O'Charley's Inc. ("O'Charley's"). On May 2, 1991, O'Charley's purchased the land and improvements described in the above lease from James H. Wallace, Jr.

On April 9, 1991, Mr. Wallace delivered to you a letter which gave you notice of termination of your tenancy under the Lease, effective as of May 10, 1991.

As of 12:01 a.m., May 11, 1991, you will have no right' to occupy the land and/or office building situated on the leased premises. O'Charley's hereby demands that *you either vacate the premises or reach an agreement with O'Charley's regarding your continued occupancy of the premises subsequent to May 11, 1991.*

In the event that you have not vacated the premises or *reached a written agreement with O'Charley's regarding your continued occupancy of the premises, on a month-to-month basis or otherwise,* O'Charley's will seek to enforce its right to the leased premises through whatever legal means are available. This may include, but need not be limited to, a lawsuit in a court of competent jurisdiction asking for possession of the premises, damages, and such mandatory injunctive relief as may be necessary and appropriate.

It is further our understanding that you have subleased the ground floor of the office building, containing approximately 2,500 square feet, to Simmons & Masoud Insurance Agency. Obviously, since the Lease terminates as of May 10, 1991, so does your Sublease to Simmons & Masoud Insurance Agency.

We have notified Simmons & Masoud that its Sublease will terminate as of May 10, 1991, and put that subtenant on notice that it will become a tenant-at-will of O'Char-

ley's as of that date. In addition, your right to collect subrent from Simmons & Masoud will terminate as of May 10, 1991.

Please communicate to me your written intent to vacate the premises. In the alternative, in order to avoid legal action, O'Charley's and Cabana (together with Messrs. Simmons, Weaver, Tucker and Thomas) must have entered into a written agreement concerning a resolution of this matter. In either case, this must be accomplished by the close of business on May 10, 1991.

If you have not vacated the premises, or no resolution has been achieved, O'Charley's will be left with no alternative but to bring legal action against Cabana and Messrs. Simmons, Weaver, Tucker and Thomas. I remind all of you that, pursuant to the terms of the 1971 Lease, all of you are jointly and severally liable for performance of each and every obligation of Lessee and therefor for any damages and costs resulting from such a breach. Unlawful detainer of the leased premises following termination of the Lease clearly constitutes such a breach.

Harry Stavros of O'Charley's and I met with Mr. Simmons in Jackson last month to see if there was some way that the parties could amicably resolve this dispute. Mr. Simmons told us at the meeting that he did not see that there was anything to discuss, and that all of you, including him, would refuse to vacate the premises as of May 10th. Mr. Simmons further indicated there was no way that this matter could be compromised.

Mr. Stavros and I advised Mr. Simmons to obtain legal advice before taking such an adamant position. He assured us that he would. Nevertheless, neither Jimmy Wallace, Harry Stavros nor I have heard anything from him. We can only assume, therefore, that his position has not changed in any respect.

The consequences of the Lessees' failure to extend the Lease are obviously economically severe. However, neither Jimmy Wallace nor O'Charley's controlled or in any way influenced the Lessees' failure to extend the term of the Lease. The simple fact is that the Lessees' failure to extend the term of the Lease absolutely terminates the Lessees' right of possession as of May 10, 1991.

O'Charley's is ready, willing and able to enforce its legal rights in respect to the leased premises. We are also ready, willing and able to sit down with the Lessees and negotiate an orderly and amicable transition. Please take advantage of this opportunity to avoid what will surely otherwise be a very expensive, time consuming, and ultimately unsuccessful effort on your part to resurrect a Lease which is about to be legal [sic] terminated.

Very truly yours,

MANIER, HEROD, HOLLABAUGH & SMITH

By: Laurence M. Papel

(Emphasis added).

The appellants' proof consisted of evidence to support their contention that they are not liable for lost profits because such was not in the contemplation of the parties. Simmons testified that he was told that O'Charley's did not intend to build until after October 1, 1991. This testimony was corroborated by Ed Woodside, an employee of Mr. Simmons. The appellants also introduced the testimony of James Ray Allison, a subtenant of part of the property in question. Mr. Allison testified that he was renting an office in the building from the appellants for One Thousand Two Hundred Seventy Dollars ($1,270.00) per month. He stated that he received from Laurence Papel a letter dated May 3, 1991, which was introduced as an exhibit to his testimony. The letter is addressed to James R. Allison and provides:

Re: Lease Agreement (the "Lease") between Wallace & Son, Partners ("Lessor") and Cabana Theatre of Jackson, Inc. *et al* ("Lessee") of Record in Trust Book 381, Page 225 Register's Office for Madison County, Tennessee—Sublease to Simmons & Masoud Insurance Agency

Dear Mr. Allison:

This will confirm our telephone conversation of Thursday afternoon. As I told you, I represent O'Charley's Inc. ("O'Charley's"). O'Charley's has purchased Jimmy Wallace's interest in the property now occupied by the Cabana Theatre building and the office building in which you sublease office space.

On April 9, 1991, Jimmy Wallace delivered a lease termination letter to Mr. James G. Simmons, Cabana Theatre of Jackson, Inc., ("Cabana") and the other named Lessees pursuant to the above referenced Lease Agreement. A copy of that letter is enclosed for your reference.

The termination came about as a result of Lessee's [sic] failure to extend the lease term as provided in the Lease. The Lease will terminate as of May 10, 1991.

It is my understanding that you have executed a Sublease with Cabana in respect to the ground floor space which you occupy in the office building. It is further my understanding that you pay $1,400 per month to Cabana for use of this space.

As a matter of law, your Sublease will terminate simultaneously with the Lease. As of May 10, 1991, you will become a tenant-at-will of O'Charley's.

Cabana and the other named Lessees are entitled to receive your rent payments for occupancy through and including May 10, 1991, but are not entitled to receive any rent from you for any part of May after that date. If you have not already paid the May rent, I suggest that you prorate the rent only through the first ten days of the month, and pay only that part to Cabana.

From May 10, 1991 on, and until you vacate the premises, all future rent should be directed to:

Harvey Stavros, Director of Real Estate
O'Charley's Inc.
P.O. Box 291809
Nashville, Tennessee 37229

*It is not O'Charley's intent to disrupt your business in any way. O'Charley's intends to eventually build a restaurant* on the site now occupied by the Cabana Theatre and your office building.

*However, we do not know exactly when the restaurant will be built, and are willing to allow you to remain in your leased premises until at least October 1, 1991.* O'Charley's can only proceed on a month-to-month basis after October 1st. Also, in this interim, O'Charley's is willing to accept the same rent for the premises you are presently paying.

As I also told you, you should consult with your attorney regarding this leasehold situation. You obviously want to protect yourself against any liability to any party. At your request, I am sending a copy of this letter to your attorney, David Hardee, in Jackson, Tennessee.

Either you or Mr. Hardee should feel free to call me if you have any questions. We want to do everything possible to accommodate your needs and fully communicate with you.

O'Charley's and I look forward to working with you over the next several months in making this transaction as smooth as possible for all parties.

Very truly yours,

MANIER, HEROD, HOLLABAUGH & SMITH

By: /s/ Laurence M. Papel

(Emphasis added).

Mr. Allison testified that he talked with Mr. Papel by telephone around May 2 and made notes during the conversation. We quote from the record:

Q. All right. Then I'll ask you what was said in that telephone conversation of May 2, 1991.

A. I jotted down notes which I customarily do in my business. I jot notes down as to any telephone conversations and date and sign them, and then after the phone conversation I then wrote a narrative of the telephone conversation. But the notes that I jotted down on May 2nd was [sic]

"Larry Papel," I had wrote that P-a-t-e-l, "O'Charley's, effective May 10, 1991, phone number 615–742–9318. Wants Simmons and Masoud at least to stay through October 1991. May 10th, 1991 rent to be paid to O'Charley's. Advised to pay pro-rata to May 10, 1991."

After the telephone conversation, I wrote it in a narrative. "Telephone call received from Larry," again I spell it Patel, P-a-t-e-l, "representing O'Charley's. He said effective May 10th, 1991 O'Charley's would take possession of building Simmons & Masoud operates in, and all rents should come to O'Charley's. Advised pro-rata payment though [sic] May 1 to May 10, 1991. O'Charley's wants Simmons & Masoud to stay until at least 10/1/1991. Wanted to know who my attorney was and advised me to seek legal counsel."

Mr. Allison testified that he told Mr. Simmons about the letter and that O'Charley's was not planning to build the restaurant until at least after October 1, 1991. Mr. Allison further testified:

Q. What, if anything, did O'Charley's tell you about their plans to build a restaurant on the property that you were occupying?

A. Okay my understanding in talking with Mr. Papel, from the telephone conversation and from his letter, was that they ultimately intended to put a restaurant there. My understanding, because I was concerned because we didn't have other premises to move our business, was that that was not a problem, that nothing was going to happen before our lease date of October 1 ran out, October 1, 1991, and we operated on that basis. The telephone conversation, that's the way understood [sic] it there and it's also the way I understood it when I read his letter that came to me first as a fax and then subsequently came through the U.S. mail. So that was my understanding.

Q. Did O'Charley's ever tell you to get up and get out, that they wanted to build a restaurant right then and there?

A. No.

Q. May 11, 1991?

A. No, they did not.

A part of Mr. Papel's cross-examination of Mr. Allison followed:

Q. Mr. Allison, prior to meeting today, you and I have talked I believe on two occasions.

A. Uh-huh.

Q. One was on the telephone last night.

A. Uh-huh.

Q. And the other was on—what your record show [sic] was May 2, 1991.

A. That's correct.

Q. I initiated that call to you; did I not?

A. Yes, you did.

Q. And I told you that we had purchased the property, I believe it was that day, and were going to build a restaurant on that site and that the lease upon which you had a sub-lease was terminated as of May 10, 1991.

A. That's correct.

Q. And I told you that we had a disagreement with Mr. Simmons where he took the position that the lease was not terminated but, in fact, he had renewed it. Is that correct?

A. That's correct.

Q. All right. You made these supposedly contemporaneous notes to our conversation.

A. Uh-huh.

Q. All right. That's not in those notes, is it?

A. Unh-unh.

Q. So there are a lot of things we talked about that aren't in those notes.

A. That's correct.

Q. And, in fact, the letter[—]In our conversation in the hallway just this morning—

A. Uh-huh.

Q. —I guess I missed once. We talked this morning before this hearing started. All right. You told me that my letter accurately reflected that phone call. Do you remember telling me that?

A. Uh-huh.

Q. Okay. But there's nothing in this letter that says that I—that O'Charley's did not want to get possession of the premises as soon as possible and that it did not want to build a restaurant as soon as possible, is there?

A. The intent—All I can tell you is the intent as I observed it—

Q. As you understood it.

A. —as I understood it, was that when you talked to me on May 2nd, that there was not a rush to move out of that office building, because I was very concerned about that particular issue. Moving a business is not an easy task. And that you indicated to me, and my understanding was that the October 1 date which was the original lease that we had with the Cabana Partnership would be fine and that that would not be a problem. Now, that also is the intent and understanding I got from your letter, particularly in that paragraph on the second page.

Q. All right. And I told you the delay was because we had to deal with the disagreement, very, very distinct disagreement with Mr. Simmons we had that he would not voluntarily quit the property, and because he would not, we could not go ahead and bulldoze it and start. Isn't that correct?

A. I do not recall that at all.

Q. All right. You just don't recall.

A. I just don't recall that at all.

Although the trial court in its findings of fact referred to and, as we perceive, erroneously construed the May 3, 1991 letter from Mr. Papel to Mr. Allison, in its conclusions, the letter was ordered stricken from the record. The trial court reasoned that the letter constituted a part of alleged settlement negotiations between Simmons, *et al,* and O'Charley's conducted on April 16, 1991, and pursuant to Tennessee Rule of Evidence 408 should be excluded.

The first issue presented for review is whether the trial court erred in excluding the May 3, 1991 letter. Appellants contend that the trial court erred in characterizing the April 16, 1991 meeting as a settlement negotiation. They assert that even if that characterization is correct, the May 3 letter was merely offered to show their lack of notice that a holdover would cause O'Charley's lost profits, and because it showed that O'Charley's did not intend to build immediately, which they now claim was their intent.

Tennessee Rule of Evidence 408 provides:

**Compromise and offers to compromise.**—Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence actually obtained during discovery merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. . . .

In this instance we believe that the trial court erred in excluding the letter to Mr. Allison. We disagree with its finding that the letter was correspondence resulting from the April 16, 1991 meeting. The letter's opening sentence stated that its purpose was to memorialize the conversation

between Mr. Allison and O'Charley's counsel on the day before, and in no way referenced the April 16 meeting. Nor, as O'Charley's contends, did the letter refer to the appellants' reluctance to move or a possible lawsuit with them which would cause a delay until October 1. There is no evidence that the conversation memorialized in the letter constituted a "compromise negotiation" within the meaning of Rule 408. O'Charley's was simply informing Mr. Allison of its purchase and instructing him on where to pay rent in the future. It was also assuring its tenant of how long he could plan on remaining in its building. Therefore, the letter and testimony surrounding it should not have been excluded under the rule. Moreover, the appellants' counsel waived any objection by agreeing to the admission of the letter, saying, "We have no objection to that letter. It's already in the record." We also note that the May 3, 1991 letter from Mr. Papel to the appellants was introduced into evidence by Mr. Burns. If any correspondence is part of settlement negotiations, this letter would so qualify. However, it is obvious that O'Charley's opened the door to this line of inquiry.

The next issue for review is whether the trial court erred in awarding O'Charley's damages for lost profits. Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm absent error of law. T.R.A.P. 13(d).

As previously noted, the May 3, 1991 letter from Mr. Papel to Mr. Allison was referred to by the trial court in its findings of fact, although it was later stricken in the trial court's conclusions. We must assume that the trial court did not consider the letter in reaching the conclusion to award damages to O'Charley's. It also appears that the trial court failed to consider Mr. Allison's other testimony as well. In any event, Mr. Allison's testimony and the May 3, 1991 letter are properly admissible into evidence and should have been considered by the trial court.

We have carefully reviewed the Papel–Allison letter and find no ambiguity. The letter clearly and unequivocally states that O'Charley's intends to "eventually" build, but the time for commencing the construction has not been determined. It is equally clear from the language used that the construction would not start prior to October 1, 1991. Mr. Allison's testimony, bolstered by his notes of the conversation with Mr. Papel, is strong evidence in and of itself, but the letter by Mr. Papel memorializing this conversation makes it appear virtually conclusive that O'Charley's did not plan to build prior to October 1, 1991. Lawyers are agents and have *prima facie* authority to speak for their client through pleadings and negotiations. Neil P. Cohen *et al., Tennessee Law of Evidence* § 803(1.2) .4 at 402 (2nd ed. 1990). The letter from counsel about a matter under his supervision is an admission of an agent within the scope of his authority. *See Home Indemnity Co. v. Bogue,* 168 Tenn. 493, 79 S.W.2d 580 (1935). In *Bogue,* the Court said:

> The admission was not conclusive, but subject to explanation or even denial. *Kenner v. City National Bank,* 164 Tenn. 288, 47 S.W.(2d) 756 [ (1932) ]. It was, however, incumbent upon defendant to explain or contradict this evidence in order to escape its effect. No such effort was made by defendant.

*Id.* at 497, 79 S.W.2d at 581.

There is no proof in the record before us that explains or attempts to explain the May 3, 1991 letter and the deliberate choice of the language used therein.

If it should be doubted that the May 3 Papel–Allison letter and related proof is insufficient to show the intention of O'Charley's regarding construction, the May 3, 1991 letter from Mr. Papel to the appellants is very strong evidence that the property was available for appellants' use after May 10, 1991. Viewing this record as a whole, we

find that the evidence does preponderate against the trial court's finding that O'Charley's intended to begin construction on or about May 11, 1991. On the contrary, the evidence establishes that O'Charley's did not intend to commence construction until at least October 1, 1991.

■ Having found that O'Charley's did not intend to begin construction until at least October 1, 1991, we must now consider the effect of this finding. The appellants appear to argue that since lost profits were not within the contemplation of the parties, and they had no notice that O'Charley's would claim such damages, they cannot be held liable therefor. This argument is apparently premised on the appellants' contention that this is a breach of contract suit. Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties. *Buquo v. Title Guar. & Trust Co.*, 20 Tenn.App. 479, 484, 100 S.W.2d 997, 1000 (1936).

■ In the case before us, however, we are dealing with a holdover tenant who is unlawfully detaining the property. Such an action is an action for a tort and is not upon the contract. The injured party is entitled to damages sustained by virtue of the unlawful detention of the premises, as in an ordinary action of tort. *Weigand v. Malatesta*, 46 Tenn. (6 Cold.) 362, 367 (1869); *Fletcher Bright Co. v. Darr*, No. 03A01–9308–CV–00277, 1994 WL 71211 (Tenn.App.E.S. Mar. 9, 1994). Citation of authority is not necessary for the proposition that there can be no recovery in tort unless the damages are proximately caused by the act of the defendant. In the instant case, damages were awarded for loss of profits. However, the proof in the record establishes that because O'Charley's did not intend to build prior to October 1, 1991, the detention of the premises until September 14, 1991, did not delay the building plans of O'Charley's; thus, no loss of profits for delay occurred. O'Charley's, as the owner of the property, is entitled to damages for accrued rent and any other damages *caused* by the appellants' retention of possession.

Accordingly, the judgment of the trial court is vacated. This case is remanded to the trial court for further proceedings to determine damages due O'Charley's consistent with this opinion. Costs of appeal are assessed against O'Charley's.

SUMMERS and BROOKS McLEMORE, Special Judges.