**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0267n.06

Nos. 11-5820/11-5844/11-6044/11-6050

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 18, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NAYLOR MEDICAL SALES & RENTALS, INC., JERRY ALLEN UNDERWOOD, | ) | |
| | ) | |
| Plaintiffs/Counter Defendants-Appellees/Cross-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| INVACARE CONTINUING CARE, INC., fka Healthtech Products, Inc.; INVACARE CORPORATION, | ) | |
| | ) | |
| Defendants/Counter Plaintiffs-Appellants/Cross-Appellees. | ) | |

Before: COOK and STRANCH, Circuit Judges; STAMP, District Judge.[*]

COOK, Circuit Judge. In this contract dispute concerning the sale of a medical equipment rental business's assets, defendants-counterplaintiffs Invacare Continuing Care, Inc., and Invacare Corp. ("Invacare") appeal the district court's bench trial judgment finding them liable for breach of contract, intentional misrepresentation, and violation of the Tennessee Consumer Protection Act ("TCPA"). Plaintiffs-counterdefendants Naylor Medical Sales & Rentals, Inc. ("Naylor"), and Jerry Allen Underwood cross-appeal the damages awarded. We AFFIRM the district court's liability findings, but REVERSE the district court's award of $210,000 in compensatory damages, $315,000 in punitive damages, and $3,000 for damage to rental beds.

---

[*] The Honorable Frederick P. Stamp, Jr., United States District Judge for the Northern District of West Virginia, sitting by designation.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

## I. Background

Invacare, a company involved in the manufacture and distribution of medical equipment, sought to expand into the medical equipment rental industry. In late 2006 it hired Scott McDaniel as a consultant to help develop its rental business. His consulting agreement structured his compensation into two components: a flat monthly fee and a quarterly bonus equivalent to a percentage of Invacare's rental profits.

Shortly after his hire, McDaniel introduced Underwood, a close friend and President of Naylor, to Invacare. Underwood knew that McDaniel worked as a consultant for Invacare and that a part of his compensation depended on the growth of Invacare's rental profits. Invacare began negotiating with Underwood regarding the sale of Naylor's assets. After several months of due diligence, Invacare proposed a purchase price between $1.8 million and $2.1 million—a valuation derived by calculating a price range around four to five times Naylor's earnings before interest, taxes, depreciation, and amortization ("EBITDA")—in a letter of intent. Underwood received only one other formal offer for Naylor, offering $1 million, retention of accounts receivable (valued at about $250,000 at the time), and job opportunities for Underwood. Eventually, after an offer and a counteroffer, Invacare and Underwood agreed on a purchase price of $2.1 million for most of Naylor's assets. They signed an asset purchase agreement ("APA") on March 31, 2008. They also verbally agreed to share profits from a bed rental business fifty-fifty, wherein Invacare would rent beds from plaintiffs (the beds were one of the few assets of Naylor's not included in the asset purchase) and re-rent them to customers.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

**A. Relevant Terms of the APA**

The APA provided that Invacare would pay $380,000 of the purchase price into an escrow, "pursuant to the terms of the Escrow Agreement." APA § 3.2(b). Under the Escrow Agreement, the escrow funds would remain deposited in a government-backed money market account until a year after the signing of the APA, where, absent a claim against the escrow funds, the money would automatically be released to Underwood. In particular, Section 3 of the Escrow Agreement permits Invacare to give notice of a claim to Naylor and the escrow agent, "specifying in reasonable detail the nature and dollar amount of any claim." Filing a notice locks the escrow funds, preventing release without the written consent of both parties or a final non-appealable court order.

The APA also contains three other sets of provisions relevant to this litigation. In Sections 5.2.4 and 5.2.6 ("Finder's Fee Provisions"), Invacare represented the following: that no broker acted for Invacare in connection with the APA, that no Invacare finder was entitled to a finder's fee, and that none of Invacare's representations contained any "untrue statement of a material fact" or omitted "a material fact necessary to make the statements contained, in light of the circumstances in which they are made, not misleading."

In Section 7.6 ("Accounts Receivable Repurchase Provision"), the parties agreed that, at Invacare's option any time before the anniversary of the sale, Naylor and Underwood would jointly and severally commit to repurchase accounts receivable that remain unpaid 180 days after the date of the invoice (minus a certain contractually defined "excess" amount and subject to a deductible). The same section guarantees to Naylor the "right to verify the existence of the unpaid balance of any

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

accounts receivable." Both this provision and the Finder's Fee Provisions were added at the request of Underwood's attorney.

Last, in Section 4.5.6 of the APA ("Customer Loss Provision"), Naylor and Underwood represented that "[n]o customer or supplier which had accounted for more than ten percent . . . of the total sales, rentals or purchases for the year 2007 and no other customer or supplier material to the Business" had "decreased or delayed materially, or threatened to decrease or delay materially" its purchase, rentals, or sales to Naylor. They also represented that they had no knowledge of facts or events that "could reasonably be expected" to cause such decreases or delays and that to their knowledge the sale would not adversely affect customer or supplier relationships.

## B. Events Leading to Claims on Escrow and Lawsuit

### 1. Events Concerning the Finder's Fee Provisions.

At some point shortly before the close of sale, Invacare's leadership discovered an ambiguity in McDaniel's Consulting Agreement that could allow McDaniel to count the revenue from the Naylor acquisition toward the calculation of his revenue-dependent quarterly bonus. Disinclined to pay such a bonus, Invacare offered to pay McDaniel a flat bonus of $30,000 in lieu of his usual profit-dependent quarterly bonus—an offer which McDaniel reluctantly accepted. Invacare called this bonus a "finder's fee" for accounting purposes (i.e., in order to capitalize the expense in the purchase price and to avoid counting the bonus as cost against the operating income of the new business). Consistent with this practice, it referred to this bonus as a "finder's fee" in internal

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

documents. Mike Will, who served as Invacare's Director of Rentals and point man in the Naylor acquisition, flagged a draft of the Finder's Fee Provision with the words "Scott McDaniel" and inquired in internal discussions whether the company should consider disclosing McDaniel's bonus to Underwood. Invacare declined to disclose this information, however.

Upon discovering McDaniel's bonus almost two years after the sale, Underwood sued Invacare for breach of the Finder's Fee Provisions. Though McDaniel described his involvement in the asset purchase as limited, Underwood claimed that his ignorance of McDaniel's role and incentives as finder caused him to acquiesce to a lower purchase price. He maintained that, absent this misrepresentation, he would have held out for a buyer willing to offer a purchase price over $3 million or would have continued to operate Naylor at a profit of about $550,000 per year.

## 2. Events Concerning the Accounts Receivable Repurchase Provision.

After taking reasonable steps to collect on the accounts receivable, Invacare gave notice to the Escrow Agent for a claim invoking the buyback right under the Accounts Receivable Repurchase Provision. Underwood invoked his right to verify the existence of the unpaid balance on the accounts receivable, requesting invoice numbers, invoice dates, and more readable spreadsheets documenting the unpaid accounts receivable. Having received no further information, Underwood refused to pay the unpaid balance of the claimed accounts receivable, and Invacare refused to release the escrow funds. Plaintiffs sued Invacare for failing to honor their verification right under the Accounts Receivable Repurchase Provision and refusing to release the escrow funds despite the

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

absence of a verifiable claim.  Invacare countersued for plaintiffs' refusal to repurchase the unpaid balance of the accounts receivable, in breach of the same provision.

### 3.  Events Concerning the Customer Loss Provision.

Sometime after the close of sale, several customers acquired from the Naylor purchase either ceased or decreased their business with Invacare, including Select Medical, Regional Medical Center, Methodist Hospital, Kindred Hospital, and Briley Nursing Home.  The decrease was gradual: at first, Briley even increased business, and the other customers maintained their business with Invacare for a few months.  According to Underwood, the competitiveness of the medical equipment rental business causes frequent customer fluctuation.  Plaintiffs thus attribute the loss of customers to fluctuations resulting from poor service, rather than to the customers' plans predating the Naylor sale.

Invacare believed, however, that plaintiffs misrepresented their customers' willingness to continue doing business with Invacare after the Naylor acquisition, in violation of the Customer Loss Provision.  Evidence at trial later revealed the possibility that Charles Nunn, the Materials Manager and Buyer for Kindred, advised Underwood as early as 2007 that Kindred would switch to a national contract.  Invacare further claimed that individuals at Select Medical, Regional Medical Center, and Methodist Hospital advised Naylor or Underwood, prior to the Naylor sale, of their plans to take their business elsewhere in 2008.  Alleging breach, Invacare presented a claim to the escrow agent based on the Customer Loss Provision.  Plaintiffs sued under the theory that Invacare breached the

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

Escrow Agreement's implied duty of good faith by presenting a baseless Customer Loss Provision claim and withholding the release of escrow funds without good reason.

## C. Procedural Posture of the Lawsuit

The plaintiffs presented several claims, the following of which survived to trial: breach of contract, conversion, a claim under the TCPA, and intentional misrepresentation. Invacare sued on several counterclaims as well, but only its claim for breach of contract survived to trial. After a bench trial, the district court ruled in favor of plaintiffs on all of its claims, except conversion, and failed to address Invacare's counterclaim. It awarded compensatory damages for breach of contract, prejudgment interest to reflect the point at which the breach occurred, punitive damages for intentional misrepresentation, an award reflecting plaintiffs' fifty percent share of the bed rental profits, compensation for damage to rental beds, and attorney's fees under the APA and the TCPA. It also ordered the release of the full amount of the escrow funds.

Both parties appeal. Invacare, the appellant/cross-appellee, requests that we reverse the district court with respect to plaintiffs' breach of contract, intentional misrepresentation, and TCPA claims; to find in its favor on its breach of contract counterclaim; to reverse or remand for recalculation of each of the district court's damages findings; to reverse the district court's award of compensation for damage to rental beds; and to reverse the district court's award of attorney's fees. Plaintiffs, the appellee/cross-appellants, request that we award a larger damages amount for breach of contract; remand for recalculation of punitive damages; and reverse the district court's denial of their request for treble damages under the TCPA.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

## II. Analysis

Where a party contests the sufficiency of the evidence supporting the district court's findings following a bench trial, *see* Fed. R. Civ. P. 52(a)(5), we review the legal claims de novo, "without determining credibility or weighing evidence, and giving the prevailing party the benefit of all reasonable inferences." *Argentine v. United Steelworkers of Am., AFL-CIO*, 287 F.3d 476, 483 (6th Cir. 2002) (citation omitted). The district court's findings of fact should remain undisturbed unless clearly erroneous, Fed. R. Civ. P. 52(a)(6), and we reverse the district court "only if reasonable minds could not come to a conclusion other than the one favoring the movant," *K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996).

### A. Liability Analysis

#### 1. Breach of Contract Claim

The district court found that Invacare breached three sets of provisions: the Finder's Fee Provisions of the APA, the Accounts Receivable Repurchase Provision of the APA, and the Escrow Agreement. We affirm.

##### a. Finder's Fee Provisions

The Finder's Fee Provisions together state the following: (1) that "[n]o broker or finder has acted for Buyer or its Affiliates in connection with [the APA]," (2) that "no broker or finder retained by Buyer . . . is entitled to any brokerage or finder's fee," and (3) that "[n]o representation or warranty by Buyer in [the APA] . . . contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein . . . not misleading."

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

APA §§ 5.2.4 & 5.2.6. The district court found that Invacare paid McDaniel a $30,000 consulting bonus, which "had all of the characteristics of a finder's fee" and which "[Invacare] internally referred to . . . as a finder's fee." The record supports these conclusions. Invacare's internal documents referred to the flat bonus as a finder's fee. The Invacare point man for the acquisition, Mike Will, recognized the bonus as a finder's fee and inquired internally whether it may require disclosure. Drawing all reasonable inferences from these facts in the plaintiffs' favor, reasonable minds could conclude that Invacare violated the representations in the Finder's Fee Provisions by promising a "finder's fee" to McDaniel, who aided as a "finder." Invacare protests that the district court never specifically identified McDaniel as a "finder," but the language of the district court opinion suggests otherwise. After noting the Black's Law Dictionary definition of "finder's fee" as "[t]he amount charged by one who brings together parties for a business opportunity," the district court found that "McDaniel introduced Underwood and Naylor to the Defendants"—i.e., acted as a finder by bringing the parties together.

Furthermore, while Invacare may have paid the flat fee in lieu of McDaniel's usual revenue-dependent quarterly bonus due to accounting reasons, the court correctly found that the defendants' accounting rationale does not necessarily preclude the payment from counting as a finder's fee. (Analogously, if a child usually receives a weekly allowance but receives a birthday present in lieu of the allowance on the week of her birthday, the present would not, for that reason, cease to be a birthday present.) The timing of the payment shortly before the close of sale and the atypical flat payment structure independent of future revenue could lead to the inference that the payment served

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

as a reward for McDaniel's role in facilitating the Naylor deal, rather than the usual reward for growing rental revenue. From these facts, a reasonable mind drawing all inferences in plaintiffs' favor could conclude, as the district court did, that Invacare offered McDaniel a finder's fee, both in name and in function.

Invacare's attempts to limit the Finder's Fee Provisions to circumstances of unfair "surprise" also fail as contrary to the provisions' plain language. Even if, as Invacare insists, parties usually agree to such prohibitions against finder's fees only because they want to foreclose "someone coming out of the woodwork claiming [entitlement] to a fee," the plain language of the agreement provides no exceptions for lack of surprise. Granted, the district court recognized that "Underwood knew McDaniel was consulting for Defendants, Underwood knew McDaniel's compensation was the bonus or fee based on his growth of Defendants' rental revenue, [and that] Underwood expected McDaniel to be paid a bonus based on growing the revenue of Naylor in the event that Defendants purchased Naylor." Even so, it could reasonably infer from the circumstances that Invacare's promise of a flat bonus created an "entitle[ment]" to a "finder's fee." The district court need not credit Invacare's one-sided explanation that Underwood's awareness of some aspects of McDaniel's incentives with Invacare falls outside of the "typical[] use[]" of finder's fee provisions. Whether or not Underwood reasonably relied on the absence of a direct link between McDaniel's pay incentives and the Naylor acquisition when accepting a purchase price, the payment still falls under the plain meaning of "finder's fee." And where no ambiguities exist, we need not resort to construing provisions against the drafter. Invacare breached the Finder's Fee Provisions by promising

- 10 -

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

McDaniel a finder's fee in lieu of his usual profit-based quarterly bonus, regardless of its accounting-related motives for paying the fee.

### b. Accounts Receivable Repurchase Provision

Section 7.6 of the APA provides that, at Invacare's option, Naylor and Underwood must repurchase accounts receivable unpaid 180 days after the date of invoice, for an amount equal to the unpaid balance less "any amount by which the Closing Net Book Value exceeds the Target Net Book Value." Central to this dispute, that section provides, "Seller shall have the right to verify the existence of the unpaid balance of any accounts receivable." APA § 7.6. The district court sided with the plaintiffs in concluding that Invacare's illegible spreadsheets violated the plaintiff's contractual right to verify the claimed unpaid balance.

Invacare relies on the more general notice provision in Section 3 of the Escrow Agreement, which only requires providing the "natural and dollar amount" of the claim in "reasonable detail." But the district court rightfully supplanted this requirement with the more specific requirement set forth in the Accounts Receivable Repurchase Provision, which requires the claimant to provide enough evidence for the plaintiffs to "verify the existence of the unpaid balance of any accounts receivable." *See Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985) ("As a rule, where there are, in a contract, both general and special provisions relating to the same thing, the special provisions control." (internal quotation marks omitted)).

The district court accepted Underwood's testimony that he unsuccessfully attempted to obtain a readable spreadsheet, unpaid invoice numbers, and invoice dates. Though Invacare's brief quips

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

that the *aggregate* figures provided in the *notice letter* are "clearly legible," that is beside the point.

Plaintiffs cannot "verify" the notice letter by just taking the claimed totals at face value. *See* App.

273; PageID 806 (conclusorily stating demands in notice letter without providing supporting

evidence). Moreover, to identify qualifying unpaid accounts receivable—that is, "accounts

receivable unpaid 180 days after the date of invoice"—plaintiffs would, at the least, need to verify

the invoice dates associated with each unpaid invoice account. The district court correctly concluded

that the plaintiffs could not "verify the existence of the unpaid balance" when Invacare failed to

disclose such information. Accordingly, we uphold the district court's factual findings regarding the

inadequate responses to the plaintiffs' requests for information and accept the district court's

determination that Invacare violated plaintiffs' verification rights under the Accounts Receivable

Repurchase Provision.

For similar reasons, Invacare's related breach-of-contract counterclaim fails as well.[2]

Invacare alleges that plaintiffs breached the Accounts Receivable Repurchase Provision by refusing

to buy back a certain amount of the unpaid accounts receivable. But that provision imposes no

obligation on the plaintiffs to honor unverified claims. We thus affirm the district court's implicit

denial of this counterclaim.

---

[2]Though Invacare discusses the counterclaim in its appellate brief as though resolved, it appears that the district court failed to acknowledge the existence of this counterclaim in its opinion. Nevertheless, we need not remand, as we deem this counterclaim implicitly rejected. *See Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 615 (6th Cir. 1992) ("Where a district court has implicitly decided a narrow and specific issue, we will review the findings of fact and conclusions of law which necessarily support that decision, rather than remand for a certain express determination." (citing *Brown v. Baltimore & Ohio R.R. Co.*, 805 F.2d 1133, 1141 (4th Cir. 1986))).

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

### c. Escrow Agreement

Section 3 of the Escrow Agreement establishes a claims period where "Buyer may give notice (a 'Notice') to Seller and Escrow Agent specifying in reasonable detail the nature and dollar amount of any claim (a 'Claim') it may have under the Purchase Agreement," and thus bind the Escrow Agent to make payments from the escrow "only in accordance with (I) joint written instructions of the Buyer and Seller or (ii) a final non-appealable order of a court of competent jurisdiction." Escrow Agreement § 3. The district court found that Invacare breached the Escrow Agreement by blocking the disbursement of the escrow funds in bad faith with an unsupported claim related to lost customer accounts.

Invacare submitted a notice letter complaining that at least three customer accounts ceased doing business with it after its purchase of Naylor. It claimed that Naylor and Underwood falsely represented, in violation of Section 4.5.6 of the APA, that "[n]o customer or supplier which had accounted for more than ten percent . . . of the total sales, rentals or purchases for the year 2007 and no other customer or supplier material to the Business" had "decreased or delayed materially, or threatened to decrease or delay materially" its purchases, rentals, or sales to Naylor; that they had no knowledge of facts or events that "could reasonably be expected" to cause such decreases or delays; and that to their knowledge the sale would not adversely affect customer or supplier relationships. The district court found that Invacare made this claim on the escrow funds in bad faith, deeming the evidence supporting their claim too sparse.

- 13 -

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

"[T]here is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). "What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *Id.* (quoting *TSC Indus.*, 743 S.W.2d at 173). Because bad faith concerns a question of fact, *see Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009), we uphold the district court's finding absent clear error.

No clear error exists here. Invacare generally protests that its notice met the requirements of the Escrow Agreement by providing "reasonable detail" of the "nature and dollar amount" of the escrow claim. But this assertion is irrelevant; the district court found bad faith with respect to Invacare's lost-customer-accounts claim not because of the lack of *specificity* of the notice, but rather because of lack of *support* underlying the *claim* in the notice. In determining bad faith, it looked to "all of the evidence presented at trial" rather than the language of the notice, and faulted Invacare for "not [proving] via competent evidence that they had a good faith basis for making this claim."

The available evidence, construed in the plaintiffs' favor, establishes the following. Invacare lost certain customer accounts about three or four months after the Naylor purchase. At least one account, Briley, briefly increased its business volume after the sale, and several accounts continued to transact with Invacare for a period of time before ceasing business. Denying accusations that he convinced Naylor's customers to wait to discontinue their business until after the sale, Underwood

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

attributed the loss of customers to Invacare's poor service record rather than any intentions of the customers predating the sale. The district court credited Underwood's testimony regarding the volatility of the customer base in the competitive medical equipment rental industry.

The fact that Invacare could not concretely identify any statements or recall the names of people to support their assertions of plaintiffs' prior knowledge, despite discovery and a full trial, supports the district court's finding of bad faith. Much of Invacare's evidence consists of hearsay of unnamed individuals affiliated with customer organizations—individuals who, at best, explain that the customer organization had plans to decrease or cease their business, but fail to demonstrate that Naylor or Underwood would have known about the customer's plans prior to the closing date of the Naylor sale.

As the district court recognized, Invacare's best evidence comes from the testimony that Invacare's Will, as well as Naylor's Underwood, knew about changes in Kindred's national account and the fact that Charles Nunn, the "point person" at Kindred, felt forced to use Kindred's national contract exclusively. Yet even this testimony fails to establish that anyone at Naylor *knew* of Kindred's intention to decrease or stop business. No one from Kindred appears to have threatened Naylor with loss of business. Though under a de novo standard we might have entertained the possibility that Kindred's move toward a national contract "could reasonably be expected" to cause decreases in business, we do not view the district court's contrary finding as clearly erroneous. As Underwood testified, national contracts often function as "list price[s]," and a vendor can transact with a competitor that offers a lower price or better service. A reasonable mind crediting

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

Underwood's testimony could infer, together with the fact that Kindred initially maintained the same rental levels as before the sale, that the mere existence of a customer's national contract is insufficient to support a good-faith accusation that Naylor expected a decrease in business. Thus drawing all inferences in the plaintiffs' favor and accepting the district court's credibility determinations, a reasonable mind could deem Invacare's claim so lacking in objective support as to constitute bad faith.[3]

### 2. Intentional Misrepresentation

Plaintiffs next accuse Invacare of intentionally misrepresenting that no broker or finder acted on its behalf and that no one could claim an entitlement to a finder's fee. *See* APA § 5.2.4. As the district court correctly stated, Tennessee law requires proof of the following six elements in order to establish intentional misrepresentation:

> 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (citations omitted).

Invacare challenges the second and fifth elements on appeal.

---

[3] Plaintiffs argue in the alternative that none of the lost customers' accounts involved were material, defining a "material" customer as "a customer that would cause Naylor to lay off some employees if Naylor lost the customer." But a defendant does not necessarily act in bad faith by failing to comport with the plaintiffs' idiosyncratic definition of materiality. The APA leaves "material" undefined, and plaintiffs fail to explain why Invacare's identification of material customers falls so far outside of the contract's scope that a reasonable mind may infer bad faith. We thus reject this alternative argument. A reasonable mind may infer bad faith from the dearth of evidence supporting Invacare's accusations against the plaintiffs, even assuming the materiality of each of the customer accounts lost.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

We uphold the district court's findings regarding the second element for the reasons stated above in Section II.A.1. Regarding the fifth element, Invacare faults the district court for neglecting to state its findings on whether the plaintiffs reasonably relied on misrepresentations. Indeed, though reasonable reliance is a question of fact, *see Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010), the district court omitted any discussion of reliance in its factual findings sections, and the legal analysis section merely acknowledges that "Underwood vehemently testified that he did rely on [the alleged misrepresentation that Invacare paid no finder's fee in the APA], and, importantly, he had no opportunity to discover this misrepresentation." We need not infer from this that the district court failed to support its legal conclusions, however. We may deduce that the district court implicitly found reasonable reliance, given that it specifically noted Underwood's testimony regarding reliance on the APA language shortly before concluding that intentional misrepresentation occurred, referencing the earlier fact with the word "[t]herefore." *See Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 615 (6th Cir. 1992) (permitting appellate courts to infer implicit findings of fact and conclusions of law which "necessarily support" a district court's decision on a "narrow and specific issue").

Invacare fails to show that the court clearly erred in finding reasonable reliance. It emphasizes the limited nature of the interactions between McDaniel, the recipient of the finder's fee, and Underwood: McDaniel advised regarding future opportunities for Underwood after the deal, admonished Underwood to remain patient, and counseled Underwood to decrease his valuation of Naylor. Noting that Invacare promised no future opportunities, and even included a "zipper clause"

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

in Underwood's Consulting Agreement disclaiming any promises outside of the agreement, Invacare portrays Underwood's expectation of future opportunities as unreasonable and his decision to sell Naylor at the agreed-upon price as an independent decision unaffected by McDaniel's representations. This argument misses the point. The district court evaluated whether the *APA's representations* regarding the finder's fee, rather than *the finder's statements themselves*, constituted intentional misrepresentation. We need not decide whether Underwood's reliance on McDaniel's statements were reasonable; we only need resolve whether Underwood reasonably relied on the written representations about finder's fees in the APA. The district court did not clearly err: Underwood's reliance on the express representations in a negotiated contractual document was reasonable under the circumstances. Because the district court's factual findings support each element, it correctly concluded that Invacare is liable for intentional misrepresentation.

### 3. TCPA Violation

The TCPA declares as unlawful "[e]ngaging in any . . . act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). After correctly noting that "[a] deceptive act or practice is a material representation, practice or omission likely to mislead a reasonable consumer" and that negligent misrepresentation suffices for deception, *Davis*, 325 S.W.3d at 162 (citations and internal quotation marks omitted), the district court concluded that Invacare violated the TCPA for the same reasons that it found a breach of contract and intentional misrepresentation. Invacare cursorily contests this ruling, relying on its prior arguments against the breach-of-contract and intentional-misrepresentation claims. Absent any new arguments, we

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

conclude that this challenge fails for the same reasons stated in our discussion of the breach-of-contract and intentional-misrepresentation claims.

Express representations in a negotiated contract disclaiming the use of finders and finder's fees would likely mislead a reasonable person into trusting that no finder would claim entitlement to a fee and that no deal facilitator's incentives depend specifically on the close of the sale. And given that the district court did not clearly err in inferring reckless intent from the fact that Invacare's leadership discussed disclosing McDaniel's finder's fee to Underwood but ultimately declined to do so, it follows that the court did not clearly err in deeming this omission negligent. Because "[w]hether a particular act is unfair or deceptive is a question of fact," *Davis*, 325 S.W.3d at 162 (internal quotation marks and citation omitted), we uphold the district court's determination of deception as sufficiently supported to overcome clear-error review.

**B.      Damages Analysis**

Both parties appeal the district court's damages calculations. For the reasons stated below, we reverse the district court's award of $210,000 in compensatory damages, $315,000 in punitive damages, and $3,000 for property damage, but uphold the rest.

**1. Compensatory Damages for Breach of Finder's Fee Provisions**

For Invacare's breach of the Finder's Fee Provisions, plaintiffs sought $900,000—the difference between Naylor's actual sale price of $2.1 million and their desired price of $3 million —as damages. Invacare responded that plaintiffs suffered no damages because they received a fair price for Naylor. Although the district court credited Underwood's testimony that he would have

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

sold Naylor for no less than $3 million if he had known about McDaniel's finder's fee, it reduced

the award to $210,000, or ten percent of the contract price. It explained its reduction by pointing to

Underwood's general awareness of McDaniel's consulting relationship with Invacare, that

relationship's usual revenue-dependent incentive structure, and Underwood's acceptance of a final

price around $2.1 million.[4] Plaintiffs dispute the relevance of these considerations, arguing that no

less than the full $900,000 amount requested will restore them to the position they would have

enjoyed absent the breach. *See Morrison v. Allen*, 338 S.W.3d 417, 434 (Tenn. 2011) ("[W]e

recognize that the purpose of damages for breach of contract is to place the injured party in the place

he or she would have occupied had the contract been fully performed.") (citation omitted). Invacare

likewise attacks the $210,000 figure as speculative and unsupported, but argues that the court should

have awarded nothing.

While we uphold the district court's finding of technical breach as supported by the evidence,

we cannot affirm its damages award. Though Tennessee law permits damages for contractual

breaches even where plaintiffs fail to prove the exact amount, *see Provident Life & Accident Ins. Co.*

*v. Globe Indem. Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928), it requires "proof of damages within a

reasonable degree of certainty," *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012)

(citations and internal quotation marks omitted). *See also Hannan v. Alltel Publ'g Co.*, 270 S.W.3d

1, 10 (Tenn. 2008) (noting that the "*existence* of damages cannot be uncertain, speculative, or

_____

[4]The district court erroneously stated the purchase price as $2.1185 million. The actual final price was $2.1 million.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.
v. Invacare Continuing Care, Inc., et al.*

remote," but that "[t]he *amount* of damages may be uncertain, however, if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages" (citations omitted)).

Here, the district court clearly erred in determining the factual existence of damages. *See Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 594 (Tenn. 1994) (identifying the determination of damages as a question of fact). The court credited Underwood's testimony regarding his target price of $3 million and Naylor's ability to generate profits of $550,000 per year. It then adjusted the damages amount to ten percent of the price Underwood paid, estimating that in the absence of knowledge of the payment of the finder's fee, Underwood might have bargained Invacare up by that much.[5] Yet the evidence fails to support *any* damages, let alone the $210,000 that the district court awarded or the $900,000 that the plaintiffs request.

Suppose Invacare let Underwood know before closing that it had adjusted its compensation agreement with McDaniel just days before the sale's closing—that is, *after* McDaniel counseled Underwood regarding the sale—to pay him a flat fee, and that the adjustment resulted in McDaniel being paid less than he would have been paid under the original, profit-dependent arrangement. Underwood's evidence elides answering the crucial question necessary to finding a right to damages: how knowing about the change in McDaniel's pay arrangements—paying the lump sum as a finder's fee—could have changed the sale price. What Underwood plainly did know was that Invacare

---

[5]Though both parties decry the ten percent figure as arbitrary and an abuse of discretion, arguments regarding arbitrary *valuation* are moot where the evidence fails to support the district court's finding of the *existence* of damages.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

rewarded McDaniel for growing its rental profits. So, when McDaniel counseled Underwood that his chances to find other buyers were slim, advised him about the proper valuation of Naylor, and encouraged patience, Underwood *knew* that Invacare paid McDaniel under the profit-based incentive structure at the time. Thus, Underwood was unaffected by any misunderstandings or nondisclosures about finder's fees during his price negotiations; McDaniel himself learned about the proposed flat payment structure and acquiesced to it only about a week before closing.

And even assuming that any significant price negotiations occurred during the last week before closing, plaintiffs fail to explain how Underwood's knowledge of the true nature of the finder's fee arrangement—as an eleventh-hour net decrease in McDaniel's compensation structure as compared to what he would have received under the old incentive plan with the addition of all the new business generated by buying Naylor—would have affected the sale price negatively. Invacare's decision to pay a flat finder's fee in lieu of the profit-dependent bonus resulted in a *decrease* in pay for McDaniel. Underwood fails to offer evidence to support his theory that this failure to disclose the finder's fee—that *lessened* Invacare's pay incentives to McDaniel—would have supplied Underwood with reason to forgo reliance on McDaniel's purchase-price advice, such that he would have held out for more. Accordingly, we reverse this portion of the award as unsupported by the evidence.

### 2. Release of Escrow Funds

Plaintiffs demanded release of the full escrow amount, $380,000, arguing that both of Invacare's claims—for breach of the Accounts Receivable Repurchase Provision and for

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

misrepresentations concerning customer accounts—lacked merit. The district court agreed. For the reasons stated above in Section II.A.1, the district court permissibly found both claims meritless. Having resolved all claims, the district court correctly released the full amount of the escrow funds to the plaintiffs.

### 3. Prejudgment Interest

Plaintiffs requested the court to award prejudgment interest in order to reflect the benefit that they would have received if they had obtained the escrow funds at the time of breach. The district court correctly observed, "Tennessee law provides that prejudgment interest 'may be awarded . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.'" *See* Tenn. Code Ann. § 47-14-123. Further noting that Tennessee courts have awarded such interest where "they have been deprived of the use of that money from the time they should have received it until the date of judgment," *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000), the court awarded prejudgment interest at a ten percent rate from the final disbursement date under the Escrow Agreement to the date of its judgment, inclusive of the $5,000 of interest already accrued in the escrow funds. Invacare fails to persuade us as to any abuse of discretion. *See Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994) ("The award of pre-judgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion.") (citations omitted). It argues that the parties already agreed by contract to an acceptable interest rate by providing for the investment of the funds into a

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

government-backed money market account. But even so, Invacare fails to cite any authority suggesting that a district court abuses its discretion by deeming a higher interest rate permitted by statute more equitable as a part of its estimation of what opportunities the plaintiffs lost by forfeiting "use of this money for over two years." In the absence of a showing of an abuse of its discretion, we uphold the district court's award of prejudgment interest.

### 4. Punitive Damages and Treble Damages Under the TCPA

The district court awarded punitive damages for Invacare's intentional misrepresentations concerning the Finder's Fee Provisions, but declined to award treble damages under the TCPA after noting that the statute permits such an award only "[i]f the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation." Tenn. Code Ann. § 47-18-109(a)(3). Our reversal of compensatory damages moots these issues.

### 5. Shared Profit from Bed Rentals and Compensation for Damage to Property

Plaintiffs sued Invacare for the conversion of its enclosure beds—a claim that the district court denied and plaintiffs did not appeal. Notwithstanding the failure of the conversion claim, the district court accepted Invacare's separate contention that Underwood verbally agreed with Invacare to split the revenue from the bed rentals fifty-fifty (a finding the plaintiffs do not contest on appeal, despite Underwood's testimony to the contrary). For *that* obligation—and *not* for conversion—it awarded the plaintiffs their share of the revenue ($7,000) and awarded an additional $3,000 for damage to the beds. Invacare concedes the $7,000 award but protests that the district court clearly erred in awarding $3,000 for damage to the beds without any substantial evidence to support the

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

award. It also claims that plaintiffs' acquiescence to Invacare's use of the beds acted as a waiver of a claim for conversion and for damages arising from the conversion.

We reverse the $3,000 award for damage to the rental beds. The district court determined that no conversion had occurred, and the parties concede this on appeal. It follows, then, that the plaintiffs' entitlement to money arises only from the breach of the oral agreement to share rental profits. "'Generally speaking, damages for breach of contract include only such as are incidental to or directly caused by the breach and may be reasonably supposed to have entered into the contemplation of the parties.'" *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)). The district court did not explain or justify its judgment as to how the damage to the beds relates to the breach. Plaintiffs offer none. The oral contract created an expectation interest in sharing revenue, not in keeping beds in good repair for Underwood. Plaintiffs offer no evidence to suggest that Invacare bore the obligation to maintain and repair as renter, as opposed to Underwood, as owner. Moreover, the district court remained silent as to whether the damage to the rental beds rose to the level of violating any implied duties of care. (Whatever the damage, the district court deemed it insufficient to constitute conversion.) We therefore reverse this portion of the award as unsupported by evidence or reasoning.[6] *See Beaty v. McGraw*, 15 S.W.3d 819, 829

---

[6]Invacare additionally argues that plaintiffs' photographs are too "blurry" to show damage. But absent clear evidence countering property damage, we will not second-guess the district court's factual assessments regarding the condition of the rental beds. The factfinder, rather than this court, scrutinizes blurry pictures for property damage. In any case, the problem is not that the allegations of damage lack support, but rather that the allegations of damage appear logically unrelated to the legal right on which the plaintiffs and the district court rely.

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

(Tenn. Ct. App. 1998) (explaining that "[w]hether the trial court has utilized the proper measure of damages is a question of law," even though the assessment of the proper amount "is a question of fact").

## C. The District Court Properly Awarded Attorney's Fees.

The district court correctly awarded attorney's fees to the plaintiffs for prevailing on the TCPA claim and the breach of contract claims. *See* Tenn. Code Ann. § 47-18-109(e)(1) ("Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action reasonable attorney's fees and costs.").

The district court also correctly awarded attorney's fees for Invacare's breach of contract. Tennessee law usually requires "litigants [to] pay their own attorney's fees unless there is a statute or contractual provision providing otherwise." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005) (citation omitted). In this case, the parties agreed, under APA § 8.2, that "Buyer shall indemnify Seller and the Shareholder . . . from . . . any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant or obligation" concerning the APA and "any and all costs and expenses (including reasonable legal and accounting fees) related to any of the foregoing." The district court thus correctly determined that the plain language of the parties' contract required Invacare to indemnify Naylor and Underwood from all costs related to the breaches, including legal fees. Invacare cites APA § 8.4 in response, without further elaboration, and to no avail. Section 8.4 only limits recovery under APA § 8.1(a), which concerns indemnification "by Seller and the Shareholder"—a completely different provision.

- 26 -

Nos. 11-5820/11-5844/11-6044/11-6050
*Naylor Med. Sales & Rentals, Inc., et al.*
*v. Invacare Continuing Care, Inc., et al.*

### III. Conclusion

We AFFIRM on all claims, AFFIRM the release of the escrow funds subject to prejudgment interest at a rate of ten percent, and AFFIRM the award of attorney's fees. We REVERSE, however, the district court's award of $210,000 in compensatory damages; $315,000 in punitive damages; and $3,000 for damage to plaintiffs' rental beds.